# In the United States Court of Federal Claims

No. 18-1438
(Filed: March 17, 2020)

|  |  |
|---|---|
| **LARRY MOFFITT JR., et al.,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**UNITED STATES,**<br><br>*Defendant,* | **Keywords:** rails-to-trails, easements, Fifth Amendment, takings, railroad, right-of-way, merger doctrine, summary judgment, railbanking, RCFC 56(a) |

*Steven Wald*, Stewart Wald & McCulley LLC, St. Louis, MO, with whom were *Michael Smith, Thomas Stewart,* and *Elizabeth McCulley*, for Plaintiffs.

*Christopher Chellis*, United States Department of Justice, Environment & Natural Resources Division, Natural Resources Section, and *Jean Williams*, United States Department of Justice, Environment & Natural Resources Division, Deputy Assistant Attorney General, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

This case arising under the National Trails System Act, as amended, 16 U.S.C. § 1247(d) (the "Trails Act"), concerns several parcels of land along a railway line in Bennington, Vermont. Before the Court are the parties' cross-motions for partial summary judgment. Plaintiffs filed their Motion for Partial Summary Judgment on October 25, 2019, seeking summary judgment on the claims brought by Keith Martin and Three Forty Realty, LLC. (Pls. Mot., ECF Nos. 27–28). On December 6, 2019, the United States filed its Response and Cross-Motion for Partial Summary Judgment, seeking summary judgment on fourteen claims, including the claims brought by Keith Martin and Three Forty Realty. (Def. Mot., ECF No. 33). On December 23, 2019, Plaintiffs filed their Response and Reply. (Pls. Reply, ECF No. 34). In this, Plaintiffs conceded that the claims subject to the United States' motion should be dismissed, except for the Mary Webb,[1] Keith Martin, and Three Forty Realty claims. (*Id*. at 3). On January 10, 2020, the United States filed its Reply.[2] (Def. Reply, ECF No. 35). The Court heard oral arguments on March 6, 2020. This matter is now fully briefed and ripe for decision.

For the reasons set forth below, the Court **GRANTS-IN-PART** the United States'

---

[1] Plaintiffs conceded dismissal of this claim during oral argument. (Tr. of Oral Arg. at 26).

[2] The United States also filed a Notice of Correction on February 3, 2020 withdrawing their contentions as to the boundaries of the condemnation proceeding. (Def. Notice of Correction, ECF No. 38).

Motion with respect to claims brought by Moffit, Jr.; 210 Depot Street LLC; Carey; Simone C. Coyne Life Estate; DML Corporation; Elliott; The Estate of Doris Bigart; Tremblay Jr.; 204 Lincoln Street, LLC; 206–210 Lincoln Street, LLC; Brizana, Inc.; and Mary Webb.[3]

In addition, as explained below, the Court **DENIES-IN-PART** the United States' Motion with respect to the claims brought by Keith Martin and Three Forty Realty, LLC and **GRANTS** Plaintiffs' Motion for Partial Summary Judgment on the claims brought by Keith Martin and Three Forty Realty, LLC.[4]

## I. Background

The property at issue is a 1.57-mile segment of a railroad right-of-way corridor running through the Town of Bennington, Vermont. (Def. Mot. at 5). This segment is part of a 131-mile rail line owned by the State of Vermont and currently operated by Vermont Railway, Inc. ("VTR"), but has been owned or used by several railroad companies over the years.[5] (Def. Mot., Ex. 1). In 1964, the Interstate Commerce Commission ("ICC") authorized the State of Vermont and VTR to assume responsibility for this line. (Def. Mot., Ex. 2). The Plaintiffs own properties that abut the right-of-way corridor used for the rail line. (Def. Reply at 3).

The right-of-way corridor at issue was established in 1857 through condemnation proceedings brought by the Western Vermont Railroad ("WVR") against Samuel Fay (the "Fay Proceeding"). (Pls. Mot. at 8–10, Ex. H-1; *see also* Def. Notice of Correction). Through the Fay Proceeding, WVR acquired an easement burdening the parcels now owned by the Plaintiffs in this suit. (Pls. Mot. at 8–10, Ex. H-1; *see also* Def. Notice of Correction). Thereafter, the railroad operated a rail line on the right-of-way corridor. (Pls. Mot. at 8–10, Ex. H-1; *see also* Def. Notice of Correction).

In 2004, the Surface Transportation Board ("STB"), a successor agency to the ICC, authorized VTR to operate the line under a modified certificate, which exempted VTR from the requirements of 49 U.S.C. § 10903 regarding termination of operations. (Def. Mot. at 6). On July 5, 2018, VTR filed a Notice of Exemption, pursuant to 49 C.F.R. § 1152.50, seeking to abandon rail service over the 1.57-mile segment of rail line and, instead, pursue a public use and interim trail use agreement with the Town of Bennington. (Def. Mot., Ex. 1). On September 14, 2018, pursuant to VTR's Notice and the Town of Bennington's request, the STB issued a Notice of Interim Trail Use ("NITU") which stayed the abandonment process, authorized recreational trail use, and preserved the STB's jurisdiction over the corridor. (Def. Mot., Ex. 2). On October 16, 2018, the Town of Bennington, State of Vermont, and VTR filed their interim trail use agreement with the STB. (Def. Mot., Ex. 4). Under the terms of the agreement, the Town of

---

[3] Respectively, Parcel Nos. 051-015-66906; 051-015-66934; 051-015-66905; 051-015-66909; 051-015-66940; 051-015-66913; 051-015-66912; 051-015-66907; 051-015-66902; 051-015-66899; 051-015-66900; 051-015-66901; 051-015-66904; and 051-015-66911.

[4] Parcel Nos. 051-015-66129 and 051-015-66128.

[5] Successive ownership of the right-of-way is not at issue. For the sake of brevity, this Opinion occasionally refers to the owner of the rail line as simply "the railroad" without denoting which company owned and operated the line in the relevant time period.

Bennington assumed responsibility for the management of the right-of-way corridor as well as legal and tax liability. (*Id*.). Thereafter, the Town of Bennington began the process of transforming the rail line into a recreational trail.

## II. Standard of Review

Pursuant to RCFC Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might significantly alter the outcome of the case; factual disputes that are not outcome-determinative will not preclude summary judgment. *Id*.

The moving party bears the initial burden of proof, but this burden may be discharged by showing the absence of evidence supporting the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether summary judgment is appropriate, the court should not weigh the credibility of the evidence, but simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. When both parties move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

## III. Discussion

The parties each seek summary judgment on the Keith Martin and Three Forty Realty claims. (Pls. Reply at 3; Def. Reply at 2). The United States argues that the Fay Proceeding, which pre-dated the conveyance of land underlying the claim, created easements appurtenant that were extinguished through the merger doctrine when the railroad later acquired adjacent land in fee simple.[6] (Def. Reply at 6–10). With respect to the Keith Martin claim, the United States argues that Plaintiffs have failed to produce a deed essential to the tract of land underlying the claim. (*Id*. at 10).

On the other hand, Plaintiffs maintain that they have produced the Keith Martin deed, which shows that he is a successor-in-interest to the Fay Proceeding, pointing to Exhibit E, ECF No. 27-5. (Tr. of Oral Arg. at 11, 26–29, ECF No. 42). Further, Plaintiffs argue that the easement created by the Fay Proceeding was a personal easement, or an easement in gross, to which the merger doctrine does not apply. (Pls. Reply at 5–8). Therefore, Plaintiffs maintain that summary judgment is appropriate as to these claims because Keith Martin and Three Forty Realty are successors-in-interest to land burdened by the railroad's easement. (*Id*. at 8). As explained below, the Court agrees with Plaintiffs that they have satisfied their burden of producing the Keith Martin Deed and that Plaintiffs are entitled to summary judgment on the Keith Martin and Three Forty Realty claims.

---

[6] The parties' briefs focus significantly on the geographic bounds of lands subject to the Fay Proceeding under railroad source deed 30/206. However, the United States has since conceded that "Plaintiffs' reading of the geographical boundaries of [railroad source deed 30/206] is correct." (Def.'s Notice of Correction).

*a.* **The Trails Act**

The Interstate Commerce Act of 1887 vested the ICC with excusive authority over the construction, operation, and abandonment of most railroad lines in the United States. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311 (1981); *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004). The STB, as a successor agency to the ICC, was vested with this exclusive and plenary authority in 1996. 49 U.S.C. § 1302.

A railroad under the jurisdiction of the STB cannot discontinue service without the consent of the Board. *Caldwell*, 391 F.3d at 1228. To terminate service along a rail line, the railroad "must either (1) file a standard abandonment application that meets the requirements of 49 U.S.C. § 10903; or (2) seek an exemption, under 49 U.S.C. § 10502." *Id*. The Trails Act also provides a third option, colloquially known as "railbanking," whereby the railroad negotiates with a "trail operator" (typically a state or local municipality) to "assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail." *Id*. at 1229; 16 U.S.C. § 1247.

When a right-of-way is "railbanked," abandonment proceedings are stayed and the STB retains jurisdiction over the corridor with the option to restart rail service at later date. *Caldwell*, 391 F.3d at 1229; 49 C.F.R. § 1121.4. Because the abandonment proceedings are stayed, the STB retains its preemptive authority over the right-of-way, preventing the operation of state property law which might otherwise "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." *Caldwell*, 391 F.3d at 1229 (quoting 2 I.C.C.2d 591, 1986 WL 68617 (1986)). If the original easement granted to the railroad is not broad enough to encompass a recreational trail under state property law, then a Fifth Amendment "taking" of the land burdened by the easement occurs. *Id*. (citing *Preseault v. United States*, 100 F.3d 1525, 1552 (Fed. Cir. 1996) ("*Preseault II*")).

The railbanking process begins when the railroad either files an abandonment application under 49 U.S.C. § 10903 or a Notice of Exemption under 49 U.S.C. § 10502. *Id*. at 1229–30. A potential trail operator then files a railbanking petition, which must include: (1) a map and description of the right-of-way; (2) a statement assuming managerial, financial, and legal responsibility for the right-of-way; and (3) an acknowledgment that the right-of-way could be reactivated for rail service. 49 C.F.R. § 1152.29. The petitioner must also show reciprocal interest from the railroad. § 1152.29. If these criteria are satisfied, the STB will issue a Notice of Interim Trail Use ("NITU"), which allows the right-of-way to be used by the public as a recreational trail. 49 C.F.R. §§ 1152.29(b)(2) and (d).

The NITU "permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, 'consistent with interim trail use and rail banking' without consummating an abandonment[.]" *Caldwell*, 391 F.3d at 1230 (quoting 49 C.F.R. § 1152.29(d)(1)). "The NITU extends indefinitely to permit interim trail use once an 'agreement' is reached between the railroad and the trail operator." *Id*. If the railroad and trail operator reach a railbanking and interim trail use agreement, the STB's jurisdiction over the rail line is preserved. *Id*.; 49 C.F.R. § 1121.4. When the trail agreement is reached, the Fifth Amendment taking becomes permanent since the abandonment procedures are effectively blocked. *Caldwell*, 391 at 1235 (citing *Preseault II*, 100 F.3d at 1552 ("[T]he NITU operates as a single trigger to several possible

outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is blocked.")).

### b. *Vermont Law*

The threshold issue in a rails-to-trails takings analysis is whether the plaintiff "has a compensable property interest in the land allegedly taken," which can often be resolved "by analyzing the original deeds that conveyed the property to the railroad." *Chicago Coating Co. v. United States*, 892 F.3d 1164, 1167 (Fed. Cir. 2018) (internal citations omitted). This determination requires "look[ing] to the law of the state in which the property is located." *Barlow v. United States*, 123 Fed. Cl. 186, 194 (2015) (citing *Preseault II*, 100 F.3d at 1540). Here, the parcels at issue are located in Vermont and there is no dispute that Vermont law applies. (Pls. Mot. at 3; Def. Mot. at 9).

Cases interpreting Vermont law make clear that when a railroad utilizes condemnation proceedings to establish a right-of-way corridor, the property interest acquired is an easement that burdens the land abutting the right-of-way corridor, not a fee simple interest in the corridor itself. *Preseault II*, 100 F.3d at 1535 (discussing *Hill v. Western Vermont Railroad*, 32 Vt. 68 (1859) and *Troy & Boston Railroad v. Potter*, 42 Vt. 265 (1869)). The *Preseault* line of cases dealt with a similar factual scenario as here. In *Preseault*, owners of property burdened by a railroad right-of-way corridor asserted a takings claim when the corridor was converted to recreational trail use. *Preseault II*, 100 F.3d at 1527. The Federal Circuit held that under Vermont law, the original transfers of property rights to the railroads conveyed only easements, those easements were abandoned when the railroad tracks were removed, and the United States committed a Fifth Amendment taking by approving conversion of the corridor to recreational trail use. *Id*.

Thus, the Federal Circuit has held that under Vermont law, the scope of easements granted for railroad operations does not encompass the use of these easements for public recreational trails. *Id*. at 1527. Consequently, if the right-of-way corridor is later railbanked, the successors-in-interest to the parcels burdened by the railroad's easement suffer a permanent taking. *Id*. at 1533–35.

Here, there is no dispute that the railroad acquired a property interest in the right-of-way corridor through the Fay condemnation proceedings. (*See* Pls. Reply at 4; Def. Mot. at 17; Def. Notice of Correction). This means that, under *Preseault II*, the railroad acquired an easement, which burdened the land abutting the right-of-way corridor. *See Preseault II*, 100 F.3d at 1535. After the NITU was issued and the railbanking and interim trail use agreement was reached, the railroad ceased using the right-of-way corridor as a rail line and the corridor was transformed into a recreational trail. Assuming the easement was not extinguished at any point prior, this blocked any potential for abandonment of the right-of-way and the successors-in-interest to land burdened by the easement suffered a permanent taking. *See Preseault II*, 100 F.3d at 1533–35. Therefore, if Keith Martin and Three Forty Realty are successors-in-interest to the land burdened by the original easement, and the easement was not extinguished before the NITU was issued and trail use agreement was reached, Keith Martin and Three Forty Realty suffered a permanent taking that is compensable under the Fifth Amendment.

### *c.  The Fay Proceeding and Successive Conveyances*

Plaintiffs Keith Martin and Three Forty Realty claim to be successors-in-interest to land abutting the right-of-way corridor. (Pls. Mot. at 10). The right-of-way corridor was established through the 1857 condemnation proceeding between the Western Vermont Railroad Corporation and Samuel Fay. This proceeding was recorded in Bennington County, Vermont records at Book 30, Page 206, (*See* Pls. Mot., Ex. G), and condemned the following parcel for use as a railway corridor:

> Commencing at a point in the center line of said Railroad, and in the line between said [Sam] Fay and G.W. Gilson; thence in the last mentioned line N 71 ½° W 26 feet; thence southerly parallel with and 25 feet right [i.e., west] of said centerline to the line between said Fay and L. Patchin; thence in the last mentioned line S 80° E 60 feet; thence northerly parallel with and 33 feet left [i.e., east] of said centerline 105 feet; thence northerly 100 feet to a point 40 3 feet left [i.e., east] of said center line; thence northerly 102 feet to a point 50 feet left of said center line; thence northerly 100 feet to a point 75 feet easterly of said center line; thence northerly parallel with and 75 feet left [i.e., east] of said center line to the line between said Fay and G.W. Gilson; thence in the last mentioned line N 71 ½° W to the place of beginning. Containing [2.71] acres.

(Pls. Reply at 4; *see also* Pls. Mot., Ex. H-1).[7] The following overlay of Valuation Map 7 illustrates the metes and bounds of this parcel with blue tracing:

---

[7] Pls. Mot., Ex. H-1 contains the first page of the proceeding but appears to omit the second page and, instead, erroneously attaches an irrelevant page. However, the United States has now conceded that Plaintiff has accurately identified the geographical boundaries of the Keith Martin and Three Forty Parcels. (Def.'s Notice of Correction).



*Figure 1: Pls.' Tracing over Valuation Map 7 of Valuation Section V7 of the Rutland Railroad Company; (Pls. Ex. I).*

(Pls. Mot. to Supplement the Record, Ex. I, ECF No. 36).[8]

The Trustees of Vermont Soldiers Home ("Trustees") owned four acres adjacent to the corridor created by the Fay Proceeding, described as "bounded northerly by Hunt street; easterly by Depot Street; Southerly by County street and westerly by other lands of said Bennington and Rutland Railway Company." (Pls. Mot., Ex. H-2 (conveyance from the Trustees of Soldiers' Home to a successive railroad in 1899; source deed 63/593)). This parcel was labeled "Parcel 14" in ICC records and maps. (*See, e.g.*, Pls. Mot., Ex. G). The Trustees conveyed Parcel 14 to the railroad in 1899. (Pls. Mot., Ex. H-2).

Beginning in 1952, the railroad conveyed portions of Parcel No. 14 to Joseph Caracciola (labeled Parcel No. 14C in the diagram below), William Rogers (labeled Parcel No. 14B), and Shapiro Motors (labeled Parcel No. 14A). (*See* Pls. Mot., Exs. H-3, H-4). The railroad's reduced ownership of Parcel No. 14 can be seen in the revised Valuation Map 7 (the unshaded portion of Parcel 14):

---

[8] This map was created using the official maps and schedules maintained by the ICC to evaluate railroad property for rates and tax purposes. Specifically, this map is derived from Valuation Map 7 of Valuation Section V7 of the Rutland Railroad Company. (*See* Pls. Mot. at 7).



*Figure 2: ICC Map 7 (revised); Pls. Ex. F-2*

(Pls. Mot., Ex. F-2). As this map and the deed encapsulating the Caracciola conveyance make clear, Parcel 14C included a portion of the right-of-way. (*See* Pls. Mot., Ex. H-3). In 1980, Caracciola conveyed Parcel 14C to Steven Leonard. (Pls. Mot., Ex. E at 22). Finally, Leonard transferred Parcel No. 14C to Three Forty Realty in 2013. (Pls. Mot., Ex. E at 24).

The remainder of Parcel No. 14 was first conveyed to William Sennett by the railroad in May of 1964:

> Beginning at a point in the northerly line of County Street at an iron pin marking the southwesterly corner of land conveyed by [the Shapiros] thence northwardly in the westerly line of said land 430.2 feet to an iron pin marking the northwesterly corner of [the Shapiros' Lands]; said iron pin being in the southeasterly line of land conveyed by [William Rogers]; thence southwestwardly at an angle to the left of 140° 15' in the said southeasterly line 6 feet to an iron pin marking the southwesterly corner of land of said Rogers; thence northwestwardly at an angle to the right of 92° 41', 130 feet in the southwesterly line of land of said Rogers to an iron pin; thence northwestwardly at an angle to the right of 21° 52', 201.8 feet in

8

the westerly line of land of said Rogers to an iron pin marking the northwest corner of land of said Rogers, **said iron pin being also the southwest corner of land conveyed by [The Rutland Railroad] herein to Joseph J. Caracciola by quit-claim deed dated May 23, 1952; thence continuing northwardly at an angle to the left of 5° 38' in the westerly line of lands of said Caracciola 75.6 feet to an iron pin located 75 feet easterly** measured at right angles from the center line of main track, formerly of Rutland Railway; thence southwardly parallel with and 75 feet distant easterly from center line of said main track about 764.7 feet to an iron pin in the northerly line of County Street; thence eastwardly in said northerly line of County Street 142.5 feet to the place of beginning, containing 2.2 acres, more or less.

(Pls. Mot., Ex. E at 7–9 ("169/131 Deed") (emphasis added)).[9] The deed then tracks the boundary southward in a line parallel to the centerline of the tracks. (*Id.*). However small, this conveyance clearly includes a portion of the right-of-way created by the Fay Proceeding.

In December of 1964, Sennett conveyed the same parcel to Jerald Greenberg using a description identical to the 169/131 Deed. (Pls. Mot., Ex. E at 10–12 (the "169/132 Deed")). On May 8, 1986, Greenberg conveyed the parcel to Grand Union Stores, Inc. ("Grand Union"), citing and incorporating by reference the language of the 169/131 Deed. (*Id.* at 13–14). The chain of title ends with Grand Union's conveyance to Keith Martin on October 23, 1986. (*Id.* at 15).

Although the description in the deed from Greenberg to Grand Union is not identical to the description in the 169/131 Deed, the conveyance also references a 1985 survey map rendered by Richard Danskin for the purposes of the conveyance. (*Id.* at 14). While Plaintiffs have not provided the 1985 map, they have provided a second map rendered by Danskin in 1986, which was used in the conveyance from Grand Union to Keith Martin in 1986:

---

[9] The emphasized portion of the deed language refers to the southwestern-most corner of land conveyed to Joseph Caracciola.



*Figure 3: Richard Danskin survey map; (Pls. Ex. E at 18).*

(*Id*. at 15–17, 18). The deed from Grand Union to Keith Martin incorporated this map by reference. (*Id*. at 15). The map shows the "Lands of Keith Martin" located to the west of the "Lands of Seven Leonard," a successor in interest to Caracciola. (*See id*. at 18). The map shows Leonard's property line runs 75.6 feet from its southern-most point to the point where it touches the Lands of Keith Martin. (*Id*.). This distance matches exactly the distance in the 169/31 Deed—the original conveyance instrument. (*Id*. at 7–9). All three deeds describe the parcel as including land west of the Caracciola boundary. Based on these maps and deeds, the Court finds that Plaintiffs have satisfied their burden of supporting the Keith Martin claim.

Presently, Keith Martin and Three Forty Realty own parcels abutting the eastern boundary of the right-of-way corridor, just before the property line intersects Hunt Street. The following diagram depicts these parcels in light blue:

10



Figure 4: GIS Overlay Map; (Def. Ex. 11, ECF No. 33-11).

(Def. Mot., Ex. 11).

Based on these maps and deeds memorializing the various conveyances through the years, the Court concludes that Keith Martin and Three Forty Realty are indeed successors-in-interest to land burdened by the easement created through the Fay proceeding. Although there were several owners through the years, the deeds describe the succession of ownership of the parcels from the original landowners, the Trustees, to the present owners, Keith Martin and Three Forty Realty. The boundaries set forth in these deeds all encompass at least a portion of land burdened by the right-of-way corridor. (*See* Pls. Ex. E). Therefore, Keith Martin and Three Forty Realty are entitled to just compensation for a Fifth Amendment taking, so long as the easement was not extinguished at any point prior to railbanking.

11

### *d. Scope of the Railroad Easement*

According to the United States, the easement created by the Fay Proceeding was an easement appurtenant, rather than an easement in gross. (Def. Reply at 9). This contention is premised on the successive railroads' use of the corridor for railroad purposes, a benefit the United States argues "passed with the land to new owners and operators, making the easement an easement appurtenant." (*Id*. at 10). Furthermore, the United States maintains that because the railroad acquired the adjacent land—Parcel 14—in fee simple in 1899, even if Keith Martin and Three Forty Realty are successors-in-interest to land originally burdened by the easement, the easement was extinguished by nature of the merger doctrine when the railroad acquired Parcel 14 in fee simple. (*See* Def. Mot. at 18; Def. Reply at 6–9). The Court disagrees.

The key distinction between easements appurtenant and easements in gross (i.e. personal easements) is that an easement in gross serves no dominant estate. *See* 25 Am. Jur. 2d *Easements and Licenses* § 10 (1996); *see also* 139 A.L.R. 1253. Railroad easements are the quintessential example of an easement in gross. *See* Richard R. Powell, 4 *Powell on Real Property* § 34.16 at 34-164-65 (2008) ("Easements in gross for railroads, telephone and telegraph and electrical power lines, for pipelines, for stream facilities, for water ditches and business structures have been held transferrable by American courts almost without exception."); s*ee also Toscano v. United States*, 107 Fed. Cl. 179, 187 (2012) (briefly characterizing railroad easements as easements in gross); Danaya C. Wright, *Doing a Double Take: Rail-Trail Takings Litigation in the Post-Brandt Trust Era*, 39 Vt. L. Rev. 703 (2015) (describing railroad easements as commercial easements in gross).

The merger doctrine serves to extinguish easements once the dominant and servient estates come under common ownership. *See Beldock v. Town of Charlotte*, 188 Vt. 345, 354 (2010). The rationale behind this doctrine is that, once the owner of the easement acquires ownership of the burdened parcel, the benefits of the easement now exist via ownership of the whole parcel. *See* Restatement (First) of Property § 497 cmt. a (1944). In other words, the merger doctrine eliminates unnecessary land interests that may remain after the dominant and servient estates are unified. Vermont has consistently upheld application of the merger doctrine to extinguish easements appurtenant but has never recognized its application to easements in gross. *See, e.g.*, *First Nat. Bank of St. Johnsbury v. Laperle*, 117 Vt. 144, 150 (1952) (unity of ownership and possession extinguishes subordinate rights and easements); *Wilder v. Wheeldon*, 56 Vt. 344, 351 (1883) (same); *Plimpton v. Converse*, 42 Vt. 712, 717 (1870) (same).

The United States points to source deed 31/489 as the instrument that extinguished the easements. (*Id*.). This deed, in conjunction with the deed from Soldiers' Home (source deed 63/593), conveyed to the railroad parcels adjacent to the railroad tracks situated both east and west of the right-of-way. (*See* Def. Ex. 6, 7, ECF Nos. 33-6, 33-7; Pls. Ex. H-2). According to the United States, because the railroad owned rights in the right-of-way corridor and owned the land adjacent to this corridor in fee simple, the easement was extinguished by application of the merger doctrine once the railroad acquired the adjacent parcels. (*See* Def. Mot. at 18). As this occurred before the railroad conveyed parcels to Caracciola, Rogers, Shapiro, and Sennett, the United States maintains that those parcels were not conveyed subject to the easement. (*See* Def. Mot. at 18). In support, the United States relies on the Vermont Supreme Court case *Fletcher v. Ferry*, 181 Vt. 294 (2007). (Def. Reply at 7).

In *Fletcher*, the defendant drove a tractor across plaintiff's property to enter his own land. 181 Vt. at 295–96. The route, defendant contended, was an easement previously held by his parcel as a right-of-way. *Id*. at 296. Plaintiff, however, argued the easement was extinguished when both parties' properties were held in common ownership by Franklin Scribner. *Id*. The Vermont Supreme Court noted that the right-of-way was for the benefit of the dominant estate and thus ran with the land, and concluded that the easement was extinguished when the dominant and servient estates came under common ownership. *Id*. at 295–96 (citing the Rest. 3d of Property § 7.5 (2000)).

Here, however, there is no "dominant estate" that benefitted from the right-of-way corridor. The railroad did not own any rights in the relevant parcels before the Fay Proceeding and did not acquire Parcel 14 until after the easement was in place. While the railroad certainly benefitted from the easement, the benefit ran to the railroad as an entity, rather than to an estate owned by the railroad. Without any "dominant estate" benefitting from the easement, the easement cannot be an easement appurtenant. *See Rowe v. Lavanway*, 180 Vt. 505, 508 (2006) ("An appurtenant easement is one that serves a parcel of land rather than a particular person"); *Barrett v. Kunz*, 158 Vt. 15, 18 (1992) (explaining that "personal easements, or easements in gross, are intended to benefit only the holder" and are "typically those held by utility companies, which give them access to land to erect poles and lines, but . . . hold no dominant estate."). The interest in the right-of-way corridor was continuously held by successive railroad companies for railroad operations until it was abandoned in favor of recreational trail use. (*See* Pls. Mot., Exs. A, B). Thus, the property interest created through the Fay Proceeding is most appropriately classified as an easement in gross because it benefitted only the railroad as an entity, rather than a dominant estate.

As such, the United States' argument in favor of application of the merger doctrine must fail. While the Vermont courts have consistently applied the merger doctrine to extinguish easements appurtenant, this Court is unaware of any case in which Vermont has extended its limited view of the merger doctrine to include extinguishment of personal easements. Moreover, the purpose of the merger doctrine—to extinguish unnecessary land interests—has no import to easements in gross. There is no dominant parcel to merge with the servient parcel because the easement is held by a particular person (or entity) for a particular purpose. Based on the foregoing, the Court finds the easements created through the Fay Proceeding were easements in gross and, therefore, were not extinguished by application of the merger doctrine once the railroad acquired Parcel 14.

### e. Scope of the NITU

As the Western Vermont Railroad acquired only an easement for railroad purposes, its successor railroads could not have acquired more than an easement. The successors, including the most recent railroad—Vermont Railway, Inc.—continuously used the easement for railroad operations. (Pls. Mot., Ex. A). Therefore, the easement remained with the successive railroad operators for these purposes, without reverting to the landowners, until the parcel was converted into a trail. (*See id*.).

When the STB issued the NITU, pursuant to the Trails Act, the NITU severed the railroad's claim to the land because recreational use falls outside the scope of the easement.

*Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed. Cir. 2004); *Preseault II*, 100 F.3d 1525, 1552 (Fed. Cir. 1996). The burdens of the easement run with the land. *Coggeshall Development Corp. v. United States*, 23 Cl. Ct. 739 (1991); *Public Utility Dist. No. 1 of Ferry County, Wash. v. United States*, 20 Cl. Ct. 696 (1990). Upon severance, all reversionary rights vested with the successors-in-interest to the defendants of the Fay Proceeding. Keith Martin and Three Forty Realty are two of those successors. (Pls. Mot. at 10; *see* Def. Notice of Correction).

As successors-in-interest abutting the corridor, Keith Martin and Three Forty Realty retained rights to disputed property. Conversion of the rail corridor to recreational trails exceeded the scope of the easement, constituting a Fifth Amendment taking. Therefore, the United States is liable for the taking, and Keith Martin and Three Forty Realty are entitled to just compensation.

Accordingly, summary judgment is granted in favor of the Plaintiffs with regard to the Keith Martin and Three Forty Realty claims.

### IV.   Conclusion

For the foregoing reasons, the Court **DIRECTS** the clerk to enter judgments as follows:

1. Partial summary judgment in favor of the United States is **GRANTED** on the twelve claims Plaintiffs' have conceded should be dismissed: Moffit, Jr.; 210 Depot Street LLC; Carey; Simone C. Coyne Life Estate; DML Corporation; Elliott; The Estate of Doris Bigart; Tremblay Jr.; 204 Lincoln Street, LLC; 206–210 Lincoln Street, LLC; and Brizana, Inc.

2. Partial summary judgment in favor of the United States is **GRANTED** with respect to the claim brought on behalf of Mary Webb, which Plaintiffs conceded during oral argument.

3. Partial summary judgment in favor of the United States is **DENIED** with respect to the claims brought on behalf of Keith Martin and Three Forty Realty, LLC.

4. Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** with respect to the claims brought on behalf of Keith Martin and Three Forty Realty, LLC.

Finally, the parties are **ORDERED** to file a joint status report **on or before March 31, 2020**, advising the Court as to the status of the remaining claims and proposing a schedule for further proceedings.

**IT IS SO ORDERED.**

s/     David A. Tapp
DAVID A. TAPP, Judge